**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

GRAND LODGE OF PENNSYLVANIA and
all others similarly situated,

      Plaintiff,

v.                                                              CASE NO: 8:07-cv-479-T-26EAJ
                                     (Consolidated)

BRIAN P. PETERS, BRIAN F. GRIMES,
JUSTIN D. LOCKE, ANNE V. LEE, and
COAST FINANCIAL HOLDINGS, INC.,

      Defendants.
_____/

**O R D E R**

      Before the Court is Defendant Hacker, Johnson & Smith PA's Motion to Dismiss

the Consolidated Class Action Complaint and declaration (Dkts. 79 & 80), Coast

Defendants' Motion to Dismiss and attachments (Dkt. 75), Joint Motion to Dismiss of

Defendants Sandler O'Neill & Partners, L.P. and Sterne, Agee & Leach, Inc. and affidavit

with attachments (Dkts. 71 & 72-74), Requests for Oral Argument (Dkts. 76, 77 & 81),

and Lead Plaintiffs' Omnibus Opposition to Defendants' Motions to Dismiss the

Consolidated Class Action Complaint.  (Dkt. 85).  After careful consideration of the

allegations of the Consolidated Class Action Complaint (Dkt. 35),[1] the applicable law,

_____

      [1]   The Consolidated Class Action Complaint is referred to as the Complaint in this
order.

and the submissions of the parties, the Court concludes that the Complaint meets the

requirements of the Private Securities Litigation Reform Act of 1995 (PSLRA), 109 Stat.

737 for some of the Defendants but not for all.

## PARTIES

Coast Financial Holdings, Inc. (CFHI) is the parent company of Coast Bank of

Florida.  Coast Bank, which opened for business in 2000, provides consumer and

commercial banking services to individuals and small to mid-sized businesses in Florida's

Manatee, Pinellas, Hillsborough, and Pasco counties.[2]  CFHI's sole source of revenue and

operations is Coast Bank.[3]  Coast Bank's revenues include interest and fees received in

connection with real estate and other loans and from the sale of loans.[4]  Revenue is also

generated from interest and dividends from investment securities and short-term

investments.[5]

Brian P. Peters became the President and Chief Executive Officer of CFHI in

February 2004.[6]  He was also a director.  Mr. Peters resigned in July 2006.[7]  Brian Grimes

was the Chief Financial Officer of CFHI from February 2004 until he became CEO in

---

[2]   See docket 35, para. 3 of Complaint.

[3]   See docket 35, para. 3 of Complaint.

[4]   See docket 35, para. 3 of Complaint.

[5]   See docket 35, para. 3 of Complaint.

[6]   See docket 35, paras. 16 & 47 of Complaint.

[7]   See docket 35, para. 16 of Complaint.

July 2006.[8]  Mr. Grimes served as CEO until May 25, 2007, when he was terminated.[9]
Both Mr. Grimes and Mr. Peters signed the Form S-1 Registration Statement for the
secondary public offering (SPO) at issue in this case, along with all its amendments
before the Prospectus was declared effective on October 5, 2005.[10]  The remaining
officers and directors of CFHI were James K. Toomey, Joseph Gigliotti, Kennedy Legler
III, Paul G. Nobbs, Thomas M. O'Brien, John R. Reinemeyer, Michael T. Ruffino, and
M. Alex White.  They all signed the Form S-1 Registration Statement for the SPO.[11]  The
individual Defendants together with CFHI will be referred to as the Coast Defendants.

Defendants Sandler O'Neill & Partners, L.P. and Sterne, Agee & Leach, Inc.
(Underwriter Defendants) are the investment banks that served as the underwriters for
CFHI's SPO.[12]  Defendant Hacker, Johnson & Smith P.A. is the independent auditor of
CFHI.[13]

## PERTINENT FACTS

The alleged material misrepresentations and fraud committed by the various
Defendants involve CFHI's residential real estate loan portfolio, specifically its

---

[8]  See docket 35, paras. 17 & 47 of Complaint.

[9]  See docket 35, para. 17 of Complaint.

[10]  See docket 35, paras. 16 & 17 of Complaint.

[11]  See docket 35, paras. 18 & 19 of Complaint.

[12]  See docket 35, para. 20 of Complaint.

[13]  See docket 35, para. 42 of Complaint.

"construction-to-permanent" loans made to both individuals and contractors for the construction of single-family dwellings on land located in North Port, Florida.[14]  The scheme to defraud began sometime after 2002 when CFHI began pursuing an aggressive growth strategy.[15]  The president of a mortgage originator, John Miller, and then Executive Vice President and Residential Lending Manager of CFHI, Phillip Coon, approached a local builder to initiate the plan in the summer of 2004.[16]  The local builder was Jesse Battle III (Battle Sr.) who owned Construction Compliance, Inc. (CCI).[17]  The scheme involved CFHI's attracting investors, preferably from the Northeast, to lend their credit to finance the construction of single-family homes without an intent to ever occupy the homes, but to "flip" them for a profit.[18]  In this scheme of "construction-to-permanent" loans, CCI would pay CFHI the interest on the loans until construction was completed,[19] CCI would make a profit on the construction of the home, and CFHI would profit from the interest payments and the closing fees on the loans.[20]

---

[14]   See docket 35, para. 43 of Complaint.

[15]   See docket 35, para. 4 of Complaint.

[16]   See docket 35, paras. 5 & 49 of Complaint.

[17]   See docket 35, paras. 5 & 49 of Complaint.

[18]   See docket 35, paras. 47 & 53 of Complaint.

[19]   In actuality, the "interest was borrowed by the investor" and CFHI would deduct the amount of interest due at the higher construction rate interest from the borrower's balance.  See docket 35, para. 62 of Complaint.

[20]   See docket 35, para. 48 of Complaint.

The scheme continued and Defendants falsely claimed that CFHI practiced conservative lending, minimized higher risk types of lending, and maintained a high quality asset portfolio.[21]  Defendants touted falsely that most of the residential construction loans were made to individuals and not real estate investors.[22]  Defendants stated that they routinely evaluated CFHI's loan portfolio with an eye toward preventing more than 10% of its total loans from any one group of customers engaging in similar activities.[23]  CFHI falsely claimed that senior management and lending officials focused on loan review and underwriting procedures to insure that CFHI's internal loan grading system monitored the credit risk.[24]  The Defendants falsely represented that CFHI possessed disclosure controls and procedures that were effective and the Defendants represented that CFHI's financials were GAAP compliant.[25]

In reality, CFHI did not perform due diligence on the financial condition of CCI and its capability of completing construction on the North Port Development homes.[26] CFHI had loosened its lending standards by making risky loans to CCI customers, many

---

[21]   See docket 35, para. 6 of Complaint.

[22]   See docket 35, para. 6 of Complaint.

[23]   See docket 35, para. 6 of Complaint.

[24]   See docket 35, para. 6 of Complaint.

[25]   See docket 35, para. 6 of Complaint.

[26]   See docket 35, para. 24 of Complaint.

of whom were located outside Florida.[27]  The customers would lend their credit which was used to purchase more properties to sell to new investors rather than for construction costs on the existing properties.[28]  CCI was permitted to draw far more than the 10% allowed all other builders because CCI loans made up a large volume of CFHI's loan volume.[29]  The draw money was being used to partially pay for construction work, and also to invest in other properties and companies.[30]  CFHI failed to diversify, as it had previously stated, and the percentage of loans made for CCI construction increased to 25% at the end of the two-year alleged class period, which was January 22, 2007.[31]  To avoid detection by the public, CFHI asked CCI to build homes in the names of other affiliated companies to make its portfolio appear diversified.[32]

By mid-2006, CFHI had disbursed $2 million of the borrowers' money to CCI because construction deadlines were never being met and building permits became difficult to obtain.[33]  This incident resulted in the termination of Mr. Peters.[34]  CCI

[27]  See docket 35, para. 24 of Complaint.

[28]  See docket 35, para. 24, and paras. cited therein, of Complaint.

[29]  See docket 35, para. 60 of Complaint.

[30]  See docket 35, paras. 80 & 81 of Complaint.

[31]  See docket 35, para. 86 of Complaint.

[32]  See docket 35, para. 72 of Complaint.

[33]  See docket 35, paras. 84, 85 & 86 of Complaint.

[34]  See docket 35, para. 85 of Complaint.

stopped construction on all of the 482 North Port homes pursuant to the construction-to-permanent loans.[35]  At that point, no work had begun on approximately 216 of those homes, and another 112 were partially completed.[36]  By the fall of 2006, CFHI had ceased disbursing any funds to CCI, and construction liens mounted on the properties.[37]

On January 19, 2007, Defendants filed a Form 8-K revealing that CFHI's concentration of loans and loan portfolio value was far riskier and bleaker than previously represented.[38]  Prices plummeted 25%, closing at $12.10 per share on heavy trading volume.[39]  On January 22, 2007, CFHI issued a press release clarifying the Form 8-K, stating that CCI was having financial difficulty, and the price of shares dropped another 28% to $8.68 per share.[40]  Following several additional disclosures to the public, on May 24, 2007, CFHI announced that the FDIC[41] and the OFR[42] had issued a cease and desist

---

[35]   See docket 35, para. 86 of Complaint.

[36]   See docket 35, para. 86 of Complaint.

[37]   See docket 35, para. 86 of Complaint.

[38]   See docket 35, para. 89 of Complaint.

[39]   See docket 35, para. 90 of Complaint.

[40]   See docket 35, para. 91 of Complaint.

[41]   Federal Deposit Insurance Corporation.

[42]   Florida Office of Financial Regulation.

order against CFHI.[43]  On August 3, 2007, CFHI was acquired by First Banks, Inc., for a

price of $3.40 per share.[44]

Lead Plaintiffs, Troy Ratcliff and Dan Altenburg, bring this securities fraud action

on behalf of all purchasers of CFHI securities between January 21, 2005, and January 22,

2007.[45]  With respect to the Section 11 claims, Lead Plaintiffs seek relief on behalf of all

persons who purchased CFHI shares pursuant or traceable to CFHI's Registration

Statement, including the Prospectus, for its October 5, 2005, SPO of 2.5 million shares of

common stock.[46]

## APPLICABLE LEGAL STANDARDS

In a suit such as this one, brought partly pursuant to § 10(b) of the Securities

Exchange Act of 1934 and Rule 10b-5, Title I of the PSLRA imposes a heightened

pleading standard.  See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S.

71, 81, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006).[47]  The PSLRA requires plaintiffs to

---

[43]  See docket 35, para. 98 of Complaint.

[44]  See docket 35, para. 102 of Complaint.

[45]  See docket 35, para. 236 of Complaint.

[46]  See docket 35, para. 236 of Complaint.

[47]  Title I "insists that securities fraud complaints 'specify' each misleading
statement; that they set forth the facts 'on which [a] belief' that a statement is misleading
was 'formed'; and that they 'state with particularity facts giving rise to a strong inference
that the defendant acted with the required state of mind.'" Dabit, 547 U.S. at 81-82
(quoting Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 345, 125 S.Ct. 1627, 161 L.Ed.2d
577 (2005) (quoting 15 U.S.C. § 78u-4(b)(1), (2)).

allege "both the facts constituting the alleged violation, and the facts evidencing scienter,"

with particularity.  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S.Ct. 2499, 2504

(2007) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194, and n. 12, 96 S.Ct. 1375,

47 L.Ed.2d 668 (1976) and citing 15 U.S.C. § 78u-4(b)(1),(2)).  The PSLRA specifically

provides that with respect to the scienter requirement, plaintiffs must "state with

particularity facts giving rise to a strong inference that the defendant acted with the

required state of mind."  15 U.S.C. § 78u-4(b)(2).[48]  Competing inferences of scienter in §

10(b) and Rule 10b-5 must be considered to some extent in determining what meets the

"strong inference" standard.[49]

---

[48]  The Securities Exchange Act of 1934, (§ 78a et seq.), was amended in 1995 by Title I of the PSLRA, or Reform Act, and the PSLRA inserted Section 21D, which became codified as 15 U.S.C. § 78u-4.

[49]  Scienter of the defendant must be proved in § 10(b) and Rule 10b-5 cases. What exactly comprises the "mental state embracing intent to deceive, manipulate, or defraud" has not been decided definitely with respect to degree of recklessness.  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S.Ct. at 2507, and n. 3 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193-194, and n. 12, 96 S.C.t. 1375, 47 L.Ed.2d 668 (1976) and commenting on rulings in the various circuit courts of appeal).  In the Eleventh Circuit, a showing of "severe recklessness" satisfies the scienter requirement.  See McDonald v. Alan Bush Brokerage Co., 863 F.2d 809, 814 (11th Cir. 1989) (citing Woods v. Barnett Bank of Fort Lauderdale, 765 F.2d 1004, 1010 (11th Cir. 1985) and other cases).  "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."  Garfield v. NDC Health Corp., 466 F.3d 1255, 1264 (11th Cir. 2006) (quoting Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1282 (11th Cir. 1999) (quoting McDonald, 863 F.2d at 814).

A three-step format has been articulated for courts to follow in determining whether a strong inference has been sufficiently pled:

> First, . . . courts must . . . accept all factual allegations in the complaint as true.
> . . . .
> Second, courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.
> . . . .
> Third,  . . . the court must take into account plausible opposing inferences.

Tellabs, 127 S.Ct. at 2509 (citations omitted).  With respect to the third factor, the Supreme Court held that "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  Id. at 2510.  The specific question the court must ask is the following: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"  Id. at 2511.

Unlike the above claims, a claim under Section 11 of the Securities Act of 1933 does not require that the element of fraud be proven.  A Section 11 claim that is part and parcel of the 10b-5 fraud claim, however, must be pled with particularity under Rule 9(b).  See Wagner v. First Horizon Pharm. Corp., 464 F.3d 1273, 1275 & 1280 (11th Cir. 2006)

(holding that "even securities claims without a fraud element must be pled with particularity pursuant to Rule 9(b) when that nonfraud securities claim is alleged to be part of a defendant's fraudulent conduct."). Thus, the Court must determine whether the fraud underlying the § 10(b) and Rule 10b-5 claims is the same fraud relied on in challenging the veracity of the Registration Statement.

## SECTION 10(b) and RULE 10b-5 CLAIMS

To state a claim for relief under § 10(b) and Rule 10b-5, the plaintiffs must allege "'(1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) on which plaintiff relies, (5) that proximately caused his injury.'" Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1202 (11th Cir. 2001) (quoting Bryant, 187 F.3d at 1281). With respect to the misstatements or omissions of material fact as to Coast Defendants, the Court finds the Complaint sufficient to withstand a motion to dismiss. The Complaint contains factual allegations of who made the statements, where and when they were made, and why the statements were false and misleading.[50]

### Against Coast Defendants

That Lead Plaintiffs rely on confidential witnesses in making their allegations is not fatal. If the anonymous sources are described with sufficient particularly as to their positions with the company and the information alleged, then they may be used and still meet the particularity requirement. See Marrari v. Staffing Network Holdings, Inc., 395

---

[50] See docket 85, pp.14 & 15 and the numerous citations to the paragraphs of the Complaint satisfying the factual requirements of the PLSRA.

F.Supp.2d 1169, 1188 (S.D. Fla. 2005) (noting that Eleventh Circuit "has yet to directly address" the issue of whether a specific description rather than naming the witness is sufficient and following Second, Third, Fifth, and Tenth Circuits).[51]  Not only may confidential witnesses satisfy the particularity requirements, they may also form the basis on which an inference of scienter may be alleged.  See Central Laborers' Pension Fund v. Integrated Elec. Servs., 497 F.3d 546, 552 (5th Cir. 2007); In re Syncor Intern. Corp. Sec. Litig., 239 Fex. Appx. 318, 320-21 (9th Cir. 2007).  The Court finds that the confidential witnesses have been sufficiency described by their positions with CFHI and according to their positions would be reliable sources.  The statements they allegedly made or witnessed are set forth in sufficient detail to suggest reliability among them.

With respect to scienter, the question is whether "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  Tellabs, 127 S.Ct. at 2510.  The question must be answered when looking at the Complaint collectively and not by dissecting every allegation in isolation.  For example, the confidential witnesses supply the connection between Phillip Coon and the "two Brians"— Defendants Peters and Grimes—that places them at daily meetings and teleconferences in which the development of the North Port

---

[51]   See also In re Winn-Dixie Stores, Inc. Sec. Litig., No. 3:04-cv-71-J-33MCR 2007 WL 4287545 (M.D. Fla. Dec. 4, 2007) (citing Marrari); Davidco Investors, LLC v. Anchor Glass Container Corp., No. 8:04-cv-2561-T-24EAJ, 2006 WL 547989, at * 15 (M.D. Fla. Mar. 6, 2007) (citing Marrari and finding confidential witnesses were sufficiently described).

scheme was discussed.  The allegations of the Complaint establish that the confidential

witnesses can place knowledge of the detrimental loan concentration in CCI in Peters and

Grimes and all of the board of directors.[52]  Moreover, scienter alleged on the part of high

level employees of a company may establish institutional scienter on the part of the

corporation.  See In re Faro Techs. Sec. Litig., No. 6:05-cv-1810-Orl-22DAB, 2007 WL

2744610, at *10 (M.D. Fla. Sept. 18, 2007) (Faro II).  Thus, the allegations with respect to

CFHI are sufficient to satisfy the scienter requirements.

Although Coast Defendants assert the non-culpable explanation that Phillip Coon

bore the sole knowledge and burden of the entire scheme, the Court concludes that a

reasonable person would find Lead Plaintiffs' interpretation of the facts alleged is "at

least as compelling" as the Defendants'.  The Complaint, when viewed as a whole, makes

it just as plausible to draw an inference that Defendants Peters and Grimes had full

knowledge of and participated in the fraudulent conduct surrounding the North Port

scheme.  As the top officers of CFHI,[53] it is much more likely that they knew that the

construction-to-permanent loans made up the most crucial portion of its loan portfolio.[54]

---

[52]  See docket 35, paras. 58-61, 70 & 71 of Complaint.

[53]  See Zuckerman v. Smart Choice Automotive Group, Inc., No. 6:99-cv-237-
ORL-28KRS, 2001 WL 686879, at * 2 (M.D. Fla. May 3, 2001) (holding that allegations
of scienter, as severe recklessness on the part of the individuals running the company,
were sufficient in view of facts that they evaluated financial condition, had access to daily
reports, and were planning aggressive expansion of company).

[54]  Grimes' two purchases of shares of CFHI at different times in 2006 does not
negate the allegations that he knew of and participated in the scheme.  As Lead Plaintiffs
posit, it is possible that the relatively insignificant purchase may have been a tactful move

Additionally, knowledge of the cease and desist order of May 2007, coupled with the GAAP violations alleged, further support sufficiency of the allegations.  See In re Smith Gardner Sec. Litig., 214 F.Supp.2d 1291, 1302 (S.D. Fla. 2002).  Therefore, Defendants Coast's motion to dismiss the § 10(b) and 10b-5 claims should be denied.

### Against Defendant HJ&S

The misrepresentations or omissions allegedly perpetrated by Defendant HJ&S are primarily directed to the audit report it prepared, dated March 9, 2006, which encompasses CFHI's financial statements for the fiscal year ending December 31, 2005 (2005 Audit), and an audit of CFHI's internal controls over financial reporting as of December 31, 2006 (2006 Internal Control Audit).[55]  The 2005 Audit included an unqualified opinion that was part of the Form 10-K filing of March 2006, and the 2006 Internal Control Audit that was part of the Form 10-K filing of March 2007.[56]  Lead Plaintiffs alleged a long-time relationship between HJ&S and CFHI which required review of interim financial statements, an internal control audit, tax compliance and consulting, services and consents in connection with registration statements, and review of CFHI's Federal Home Loan Bank "collateral verification procedures."[57]

---

on his part to avoid suspicion of wrongdoing.

[55]  See docket 35, para. 181 of Complaint.

[56]  See docket 35, paras. 181 & 182 n. 43 of Complaint.

[57]  See docket 35, para. 181 of Complaint.

The Complaint alleges that the 2005 Audit falsely stated that CFHI's financial statements for 2004 and 2005 complied with GAAP and that the audit was performed in compliance with the standards of the Public Company Accounting Oversight Board (PCAOB).[58]  "[T]he personnel at HJ&S' Tampa office abandoned their role as independent auditor and turned a blind eye to each of numerous violations of GAAP, GAAS, SEC, SOX, and PCAOB standards" and participated in the fraud by touting CFHI as one of its clients and receiving $360,000 in fees from CFHI from 2002 through 2006.[59] Rather than allege any actionable misrepresentation in the 2006 Internal Control Audit, the Complaint asserts that the reissuance in the 2006 Internal Control Audit of its unqualified opinion on the 2005 financial statements in view of HJ&S' agreement with CFHI's management's identification of a material weakness in CFHI's internal control, amounted to a misrepresentation.[60]  Additionally, the numerous "red flags" listed, which should have placed HJ&S on notice that CFHI was engaged in wrongdoing, are all warnings covered by AU § 316, which is part of the interim auditing standards adopted by the Public Company Accounting Oversight Board, and GAAS.[61]

---

[58]   See docket 35, paras. 184, 185 & 221 of Complaint.

[59]   See docket 35, paras. 219 & 220 of Complaint.

[60]   See docket 35, paras. 191-193 of Complaint.

[61]   See docket 35, para. 203 of Complaint.  GAAS means generally accepted auditing standards which are promulgated by the American Institute of Certified Public Accountants (AICPA).  See Ziemba v. Cascade Int'l., Inc., 256 F.3d 1194, 1200 (11th Cir. 2001).

In the Eleventh Circuit, "[i]t is not enough to establish that an auditor merely erred or was negligent in failing to discover information; rather, in order to plead a securities fraud claim, Plaintiff must offer specific factual allegations that are sufficient to support the 'strong inference that the audit was so deficient that it amounted to no audit at all.'" Faro I (citing In re Sunterra Corp. Sec. Litig., 199 F.Supp.2d 1308, 1337 (2002) (citations omitted). HJ&S argues that Lead Plaintiffs have failed to demonstrate that HJ&S played a significant role which would "meet the high bar set for auditor fraud" in the Eleventh Circuit.  See In re Faro Techs. Sec. Litig., No. 6:06-cv-8-Orl-22DAB, 2007 WL 430731, at *19 (M.D. Fla. Feb. 3, 2007) (Faro I).[62]  Specifically, HJ&S contends that Lead Plaintiffs' allegations of scienter and causation as to HJ&S are lacking.

The allegations of the Complaint attempt to assert scienter on the part of HJ&S through severe recklessness[63] as opposed to intentional deceit, manipulation or fraud.

---

[62]   At the time HJ&S submitted its motion, the Supreme Court had accepted certiorari of a case involving the issue of whether a private right of action exists under § 10(b) against secondary actors who aid and abet or otherwise assist in the fraud.  See In re Charter Commc'ns, Inc. Sec. Litig., 443 F.3d 987 (8th Cir. 2006), cert. granted, Stoneridge Inv. Partners, LLC v. Scientific-Atlantic, Inc., 127 S.Ct. 1873 (2007).  The Eighth Circuit, relying on Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), held that secondary actors are excluded from  § 10(b) liability.  The Supreme Court has since affirmed and remanded, reiterating that the securities statutes "provide an express private right of action against accountants and underwriters in certain circumstances, see 15 U.S.C. § 77k, and the implied right of action in § 10(b) continues to cover secondary actors who commit primary violations." Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 128 S.Ct. 761, 773-774 (2008) (citing Central Bank, 511 U.S. at 191).

[63]   As noted above, severe recklessness is the applicable standard in the Eleventh Circuit.  See footnote 49.  "Severe recklessness is limited to those highly unreasonable

-16-

Simply articulating violations of GAAS and GAAP alone is insufficient to satisfy the strong inference of scienter on the part of HJ&S, as an independent auditor "even if the auditor is grossly negligent in carrying out its responsibilities." <u>Sunterra</u>, 199 F.Supp.2d at 1333.  To allege the inference of scienter, those violations must be accompanied by red flags sufficient to place a reasonable auditor on notice that the client was committing wrongful acts to the detriment of its investors.  <u>Id.</u> at 1333-34.

HJ&S contends that the Complaint does not contain the requisite specificity with respect to each violation of GAAP or GAAS.  Even assuming the Complaint is specific enough about the violations, it lacks, HJ&S argues, adequate facts surrounding the red flags listed.  The Court agrees based on its review of <u>Faro I</u>, <u>Faro II</u>,[64] <u>Sunterra</u>, and <u>Holmes</u>.[65]

As in <u>Sunterra</u>, the Complaint fails to allege that HJ&S ran CFHI, prepared its press releases, or audited its quarterly financial statements.  199 F.Supp.2d at 1332.  Lead

---

omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."  <u>Garfield v. NDC Health Corp.</u>, 466 F.3d 1255, 1264 (11th Cir. 2006) (quoting <u>Bryant v. Avado Brands, Inc.</u>, 187 F.3d 1271, 1282 (11th Cir. 1999) (quoting <u>McDonald</u>, 863 F.2d at 814).

[64]  <u>In re Faro Techs. Sec. Litig.</u>, No. 6:05-cv-1810-Orl-22DAB, 2007 WL 2744610 (M.D. Fla. Sept. 18, 2007) (Faro II).

[65]  <u>Holmes v. Baker</u>, 166 F.Supp.2d 1362 (S.D. Fla. 2001).  As in <u>Holmes</u>, the red flags do nothing more than "rehash" the GAAP and GAAS violations.  Unlike <u>Holmes</u>, the Complaint's allegations do not support a limited inference of scienter based on the fraud's magnitude.

Plaintiffs have failed to allege HJ&S' motive to participate in the alleged fraud, because alleging knowledge of the company's aggressive growth strategy is insufficient.  Id, at 1334.  The allegations regarding HJ&S' continuous presence at CFHI's office, without more, does not satisfy the time, place and manner requirements of scienter.  Id.; In re Coca-Cola Enters. Inc. Sec. Litig., 510 F.Supp.2d 1187, 1201 (N.D. Ga. 2007).  That HJ&S should have been suspicious of CFHI's lack of internal controls does not render the audit so fraught with recklessness that a jury could infer intent to defraud.  At most, the Complaint alleges mere negligence.

In short, there are no allegations that HJ&S was an active participant in the fraud. Faro II, 2007 WL 2744610, at *13.  Unlike In re Sunbeam Sec. Litig., 89 F.Supp.2d 1326, 1346 (S.D. Fla. 1999), there are no allegations that HJ&S had been "tipped off" by a former employee about various wrongdoings[66] or that the company's suspected manipulation of financial statements has been disseminated in a reputable business magazine.  There is nothing alleged about this audit to suggest that it was tantamount to "no audit at all."  Faro II, 2007 WL 2744610, at *14; Sunterra, 199 F.Supp.2d at 1337.

With respect to the relationship between CFHI and HJ&S, Lead Plaintiffs do not allege any stock ownership on the part of HJ&S or any other benefit other than its fees that would enure to the benefit of HJ&S.  Sunterra, 199 F.Supp.2d at 1337.  Although Lead Plaintiffs allege that HJ&S provided consulting services and were ever-present in

---

[66]   See also Faro II, 2007 WL 2744610, at *13.

the office, "there is no suggestion that this relationship compromised" HJ&S'

independence. Id. at 1338. The Complaint alleges only that HJ&S wished to retain CFHI

as a client, which "cannot be a 'special financial relationship' as it is the wish of all

auditors, and indeed all businesses to keep their client base." Faro I, 2007 WL 430731, at

*19.

Consequently, the Court finds that while the Complaint alleges mere negligence, it

fails to allege the severe recklessness necessary to meet the pleading requirements for

scienter on the part of an independent auditor. Therefore, the HJ&S' motion is granted,

and another opportunity will be permitted to amend the Complaint.

### Against Underwriter Defendants

Underwriter Defendants assert that the Complaint fails to allege that the

Registration Statement issued with respect to the secondary offering of October 4, 2005,

is materially false or misleading. Because the Court concludes, as is explained below,

that this Court does not have subject matter jurisdiction of the Section 11 claim based on

standing, the adequacy of the allegations regarding misrepresentations in the Registration

Statement and Prospectus need not be addressed.

### RATCLIFF'S STANDING TO ASSERT SECTION 11 CLAIM

Coast Defendants and Underwriter Defendants assert that Plaintiff Ratcliff lacks

standing to bring a Section 11 claim against them based on alleged false statements

contained in the Registration Statement for Coast's secondary public offering or SPO. To

possess standing to sue under Section 11, plaintiffs must be able to trace their purchase of

tainted securities to the faulty registration statement.  See Krim v. pcOrder.com, Inc., 402

F.3d 389, 492 n. 5 (5th Cir. 2005) (citing Rosenzweig v. Azurix Corp., 332 F.3d 854, 873

(5th Cir. 2003)).[67]  The reasoning of these cases is based on the plain language of section

11[68] and deference to Congress should they choose to someday expand the "virtually

absolute" liability for corporate issuers imposed by Section 11 to purchasers whose

securities cannot be traced to the misleading registration statement.  Krim, 402 F.3d at

495 & 498.  Section 11 affords relief to "any person acquiring such security" with "such"

security referring to one initially distributed by a public offering, initial or secondary.  See

Joseph v. Wiles, 223 F.3d 1155, 1159 (10th Cir. 2000).  Courts have interpreted Section

11 to bestow standing on a "subset" of security owners which includes aftermarket

purchasers provided the purchase of the securities can be traced to the misleading

registration statement.[69]  Krim, 402 F.3d at 497.  The courts must defer to Congress

should it desire to broaden the class of security owners permitted to recover pursuant to a

misleading registration statement.  Id. at 498.

An aftermarket purchaser, such as Ratcliff, however, may have standing "so long

as he can prove the securities he bought were those sold in an offering covered by the

_____

[67]  See also In re Friedman's, Inc. Securities Litig., 385 F.Supp.2d 1345, 1371 n.
28 (N.D. Ga. 1345 (N.D. Ga. 2005) (following Krim and noting agreement with another
district court that securities need not be purchased directly in the offering itself but may
be traced to the violative registration statement).

[68]  See 15 U.S.C. § 77k(a).

[69]  Purchasers who acquired their securities directly in the public offering are
necessarily part of this "subset."  Krim, 402 F.3d at 497-498.

false registration statement." <u>Joseph v. Wiles</u>, 223 F.3d 1155, 1159 (10th Cir. 2000).[70]

"There is no language limiting claims to those investors who purchase their shares in a

public offering." <u>Id.</u> at 1159.  The shares need only be "originally registered under the

allegedly defective registration statement— so long as the security was indeed issued

under that registration statement and not another." <u>DeMaria v. Anderson</u>, 318 F.3d 170,

176 (2nd Cir. 2003) (quoting <u>Lee v. Ernst & Young, LLP</u>, 294 F.3d 969, 976-977 (8th Cir.

2002)).

     Just exactly how an aftermarket purchaser shows tracing "might present a problem

of proof in a case in which stock is issued under more than one registration statement."

<u>Krim</u>, 402 F.3d at 496 (quoting <u>Hertzberg v. Dignity Partners, Inc.</u>, 191 F.3d 1076, 1080

& n. 4 (9th Cir. 1999)).  It is clear that standing cannot be based on statistical likelihoods

that all of the securities purchased can be traced to a specific faulty registration statement.

<u>Krim</u>, 402 F.3d at 498-499.[71]  In any event, the question before this Court of whether

standing to sue exists depends on the evidence submitted regarding traceability of

---

[70]  <u>See also</u> <u>DeMaria v. Anderson</u>, 318 F.3d 170, 176 (2nd Cir. 2003) (reasoning
that aftermarket purchasers, not just persons who purchased shares in the IPO, have
standing to sue under Section 11).

[71]  <u>See also</u> <u>Davidco Investors, LLC v. Anchor Glass Container Corp.</u>, No. 8:04-
cv-2561-T-24EAJ, 2006 WL 547989, at * 23 (M.D. Fla. Mar. 6, 2006) (relying on <u>Krim</u>
for the premise that standing in a Section 11 claim cannot be based on statistical tracing
theory by showing a very high probability that shares can be traced to allegedly defective
registration statement).

Ratcliff's purchases to the alleged false and misleading registration statement for the secondary public offering of CFHI.

Lead Plaintiffs assert that they should not be required to prove, as opposed to allege, at the motion to dismiss stage that Ratcliff's aftermarket purchase of CFHI stock can be traced to the allegedly false and misleading secondary public offering. Paragraph 13 of the Complaint alleges that Ratcliff "purchased shares of CFHI stock traceable to the Company's SPO." Paragraph 25 of the Complaint alleges that Ratcliff and others bought shares of CFHI common stock that were "issued pursuant to or traceable to the October 5, 2005 SPO." The SPO occurred in October 2005. According to Coast Defendants, Ratcliff purchased shares of CFHI on January 19, 2006, and September 21, 2006. Thus, on its face, it is conceivable, as far as timing is concerned, that Ratcliff's shares could possibly be traced to the SPO.[72] While it is conceivable, however, Lead Plaintiffs have not set forth how they could show that Ratcliff's purchases of SPO stock were traceable.[73]

Lead Plaintiffs cite cases other than <u>Davidco</u>, which is the case relied on by Coast Defendants and the Underwriter Defendants, in which the district courts held that whether the lead plaintiffs can trace their aftermarket purchases to the SPO is inappropriate for

---

[72]   In the SPO, 2.5 million shares of CFHI common stock were offered to the public at $15.50 per share. <u>See</u> docket 35, para. 22 of Complaint.

[73]   On January 19, 2006, Ratcliff purchased 1,250 shares of CFHI stock at $16.50 per share, and on September 21, 2006, at $16.77 per share, both prices at least $1.00 higher than the SPO price of $15.50. <u>See</u> docket 74, Waggoner Aff., Ex. C—certification of Ratcliff sworn to Mar. 12, 2007, found also at docket 1 in closed case 8:07-cv-504-T-26MAP.

determination on a motion to dismiss.[74]   See, e.g., In re Sterling Foster & Co., Inc. Sec.

Litig., 222 F.Supp.2d 216, 247-248 (E.D. N.Y. 2002).[75]   The district court in Sterling

reasoned that traceability "goes to the merits of the [subclass'] Section 11 claim rather

than to whether the [subclass] has standing to bring the claim in the first instance."   Id. at

247-248.   Pursuant to this reasoning, the district court found, relying on Barnes v.

Osofsky, 373 F.2d 269, 273 (2d Cir. 1967), and other more recent cases, that simply

alleging that the securities at issue were purchased "pursuant to or traceable to" the

registration statement for the securities is sufficient.   Sterling, 222 F.Supp.2d at 247.   In

addition to the cases holding contrary to Davidco, the Lead Plaintiffs attempt to

distinguish Krim.   The standing issue in Krim, they assert, was decided on a full

---

[74]   The cases cited by Lead Plaintiffs are In re Global Crossing, Ltd. Sec. Litig.,
313 F.Supp.2d 189, 208 (S.D. N.Y. 2003) (listing cases holding that general allegations
that the suspect shares can be traced to the false registration statement are sufficient to
state a claim); In re Immune Response Sec. Litig., 375 F.Supp.2d 983, 1039 (S.D. Cal.
2005); In re Suprema Specialties, Inc. Sec. Litig., 334 F.Supp.2d 637, 649 (D. N.J. 2004),
rev'd on other grounds, 438 F.3d 256 (3rd Cir. 2006); In re Seebeyond Techs. Corp. Sec.
Litig., 266 F.Supp.2d 1150, 1171-72 (C.D. Cal. 2003); and In re Sterling Foster & Co.,
Inc. Sec. Litig., 222 F.Supp.2d 216 (E.D. N.Y. 2002); see also  Caiafa v. Sea Containers,
Ltd., 525 F.Supp.2d 398 (S.D. N.Y. 2007); In re Levi Strauss & Co. Sec. Litig., 527
F.Supp.2d 965, 974 (N.D. Cal. 2007) (citing Guenther v. Cooper Life Sciences, Inc., 759
F.Supp. 1437, 1439 9N.D. Cal. 1990)); but see Congregation of Ezra Sholom v.
Blockbuster, Inc., 504 F.Supp.2d 151 (N.D. Tex. 2007) (relying on Krim and holding
there is a higher pleading standard for Section 11 standing).

[75]   The Sterling court held that whether shares allegedly purchased from a
secondary public offering could be actually traced to the secondary offering or merely to
the open market, is a determination not to be made at the dismissal stage.   In re Sterling,
222 F.Supp.2d at 247-248.

evidentiary record because the court was resolving a motion for class certification as opposed to a motion to dismiss.

Independent research reveals that there is no authority in the Eleventh Circuit answering the precise question of exactly what is necessary at the pre-discovery stage to demonstrate Section 11 standing.  The only Eleventh Circuit case that discusses standing to bring a Section 11 claim recognizes the necessity of being "able to 'trace' the security he acquired to that defective statement."  APA Excelsior III L.P. v. Premiere Techs., Inc., 476 F.3d 1261, 1271 (11ᵗʰ Cir. 2007) (citing Herman & MacLean v. Huddleston, 459 U.S. 375, 382, 103 S.Ct. 683 (1983) and Barnes v. Osofsky, 373 F.2d 269, 271-73 (2d Cir. 1967)).[76]  To establish standing, a plaintiff "must show that the security was issued under, and was the direct subject of, the prospectus and registration statement being challenged." Premiere Techs., 476 F.3d at 1271 (citing Barnes).

After reviewing all of the cases cited by the parties on the issue of Section 11 standing and recognizing that those cases cannot be reconciled, the Court chooses to

---

[76]   In using the rationale of standing to make an analogy regarding a different issue under Section 11, the Eleventh Circuit stated:

> In order to have standing and prevail on a claim under Section 11 a plaintiff must be able to trace his stock to the defective registration statement.  It is undisputed that if stock is purchased in a prior offering, and before a defective registration statement is issued, then no relief may be had as the pre-registration purchaser falls outside the scope of Section 11.  See, e.g., Barnes, 373 F.2d at 273.

APA Excelsior, 476 F.3d at 1276.

follow those courts requiring more than the mere allegation that the purchase of the stocks were "traceable to" the tainted registration statement and prospectus.  This approach seems prudent in this particular case because the false and misleading statements are directed to a second public offering and Ratcliff did not purchase his shares in the SPO, but rather in the aftermarket some three months after the SPO.  Moreover, Lead Plaintiffs have not suggested what evidence they intend to use to show that the particular shares purchased by Ratcliff can be traced to the stocks issued in the SPO.  Thus, the Court finds that, in this case, Lead Plaintiffs have not sufficiently alleged that the CFHI stocks purchased are traceable to the second offering.[77]  Mindful of the edict to determine whether this Court possesses jurisdiction through the plaintiff's standing and whether the requirement that more than mere "wholly conclusory" allegations have been made,[78] the Court grants the motions to dismiss the claims brought pursuant to Section 11.

It is **ORDERED AND ADJUDGED** as follows:

(1)     Defendant Hacker, Johnson & Smith PA's Motion to Dismiss the Consolidated Class Action Complaint (Dkt. 79) is **GRANTED.**

(2)     Coast Defendants' Motion to Dismiss (Dkt. 75) is **GRANTED in part and DENIED in part.**

---

[77]    See docket 35, paras. 13 & 25 of Complaint.

[78]    Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1968 (2007) (reasoning that complaint should not withstand motion to dismiss based on "possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery").

(3)     Joint Motion to Dismiss of Defendants Sandler O'Neill & Partners, L.P. and

         Sterne, Agee & Leach, Inc. (Dkt. 71) is **GRANTED.**

(4)     The Requests for Oral Argument (Dkts. 76, 77 & 81) are **DENIED as**

         **moot**.

(5)     The claim brought pursuant to Section 11 is dismissed.

(6)     Lead Plaintiffs shall have up to and including twenty (20) days from the

         date of this order to file an amended complaint in accordance with this

         order, which complaint shall list each individual Defendant being sued in

         the style of the case.  Defendants shall file their responses within twenty

         (20) days of receipt of the amended complaint.

**DONE AND ORDERED** at Tampa, Florida, on March 13, 2008.


         s/*Richard A. Lazzara*
         **RICHARD A. LAZZARA**
         **UNITED STATES DISTRICT JUDGE**


<u>COPIES FURNISHED TO</u>:
Counsel of Record


-26-